## UNITED STATES DISTRICT COURT
## DISTRICT OF MARYLAND
## SOUTHERN DIVISION

|  |  |
|---|---|
| ROBB EVANS AND ASSOCIATES LLC, AS COURT-APPOINTED RECEIVER IN THE *IN RE SANCTUARY BELIZE LITIGATION*<br><br>                                   Plaintiff,<br><br>      v.<br><br>JORGE DIAZ-CUETO and BELLA MAR ESTATES, LTD.,<br><br>                                   Defendants. | No. 8:21-cv-2049 |

## **COMPLAINT**

Robb Evans and Associates LLC, as Court-appointed Receiver in the action more particularly set forth below ("Receiver" or "Plaintiff"), for its complaint against defendants Jorge Diaz-Cueto ("Diaz-Cueto") and Bella Mar Estates, Ltd. ("Bella Mar") (Diaz-Cueto and Bella Mar are collectively referred to as the "Defendants") alleges and states as follows:

### Statement of Jurisdiction and Venue

1.      On October 31, 2018, the Federal Trade Commission ("FTC") filed a Complaint for Permanent Injunction and Other Equitable Relief (the "Sanctuary Belize Litigation") docketed as case number 18-cv-3309, assigned to Senior United States District Judge Peter J. Messitte of the District Court for the District of Maryland (the "Issuing Court").

2.      On November 5, 2018, the Issuing Court issued an Ex Parte Temporary Restraining Order With Asset Freeze, Writs *Ne Exeat*, Appointment of a Temporary Receiver, and Other Equitable Relief, and Order to Show Cause Why a Preliminary Injunction Should Not Issue ("TRO").

3.      Under the TRO, the Receiver became temporary receiver over Global Property Alliance, LLC, Sittee River Wildlife Reserve, Buy Belize, LLC, Buy International, Inc., Foundation Development Management, Inc., Eco-Futures Development, Eco-Futures Belize, Ltd., Power Haus Marketing, Sanctuary Belize Property Owners' Association, Prodigy Management Group LLC, Foundation Partners, BG Marketing, LLC, Ecological Fox, LLC, Belize Real Estate Affiliates LLC, Exotic Investor LLC, Southern Belize Realty LLC, and each of their subsidiaries, affiliates, successors and assigns, as well as any other entity that: (1) is located at, registered to, or operated from 3333 Michelson Drive, Suite 500, Irvine, California, and assists, facilitates, or otherwise conducts business related to the sale of real estate in Belize; (2) assists, facilitates, or otherwise conducts business related to the acts identified in the Findings of Fact in the TRO, and is owned or controlled by any defendant; or (3) are assets that are otherwise in the Receivership and that are corporations or other legal entities.  The Receiver was also appointed receiver over the assets of Andris Pukke ("Pukke") and Peter Baker ("Baker") valued by the Receiver at $1,000 or more.

4.      The Receiver's role as temporary receiver under the TRO was continued by the Interim Preliminary Injunction entered by the Issuing Court on November 20, 2018.

5.      Pursuant to § XVI.W and § XVI.X of the TRO, the Receiver determined that Newport Land Group LLC ("Newport") was a receivership entity and properly notified the parties in interest of this determination on December 5, 2018.

6.      The Receiver's role was made permanent pursuant to Preliminary Injunctions entered on February 9, 2019 and October 3, 2019 (collectively, the "Preliminary Injunctions"). The February 9, 2019 Preliminary Injunction made the Receiver permanent receiver over BG Marketing, LLC, Ecological Fox, LLC, and Foundation Partners and each of their subsidiaries, affiliates, successors and assigns and also expressly named Newport as a receivership entity.

7.       The October 3, 2019 Preliminary Injunction made the Receiver permanent receiver over Newport, as well as Global Property Alliance, Inc., Sittee River Wildlife

Reserve, Buy Belize, LLC, Buy International, Inc., Foundation Development Management, Inc., Eco-Futures Development, Eco-Futures Belize, Limited, Power Haus Marketing, Sanctuary Belize Property Owners' Association, Prodigy Management Group LLC, Belize Real Estate Affiliates LLC, Exotic Investor LLC, and Southern Belize Realty, LLC, and each of their subsidiaries, affiliates, successors and assigns, together with 2729 Bristol LLC, 3905 Marcus, LLC, as well as any other entity that is located at, registered to, or operated from 3333 Michelson Drive, Suite 500, Irvine, California and assists, facilitates, or otherwise conducts business related to the sale of real estate in Belize; assists, facilitates, or otherwise conducts business related to the acts identified in the Findings of Fact in the Preliminary Injunction, and is owned or controlled by any defendant; or are identified as assets, as defined in the Preliminary Injunction, that are otherwise in the receivership and that are corporations or other legal entities.  Pursuant to the Preliminary Injunction, the Receiver was also appointed as receiver over the assets of Pukke, Baker and Luke Chadwick ("Chadwick") valued by the Receiver at $1,000 or more.

8.      On January 13, 2021 the Issuing Court entered its Order for Permanent Injunction and Monetary Judgment Against Defaulting Defendants John Usher et al. ("Default Judgment").  Pursuant to the Default Judgment, the Receiver remained as permanent receiver over the Defaulting Corporate Defendants, as defined therein, and John Usher ("Usher") was ordered to transfer his assets to the Receiver, which would become assets of the receivership estate, with limited exceptions as set forth in the Default Judgment.  On March 24, 2021 the Court entered its Amended Final Order for Permanent Injunction and Monetary Judgment Against Defendants Andris Pukke, Peter Baker and Luke Chadwick ("Pukke Final Judgment").  The Receiver remained as permanent receiver over the assets of Pukke, Baker and Chadwick, with limited exceptions set forth in the Pukke Final Judgment.  Other final judgments have been entered in the Sanctuary Belize Litigation, each of which vested certain duties, powers and authority in the Receiver.

9.      The various Court orders and judgments giving the Receiver its powers in the Sanctuary Belize Litigation are referred to collectively as the "Receivership Orders." The various entities and persons subject to the Receivership Orders are referred to herein collectively as the "Receivership Entities."

10.     The Receivership Orders give the Receiver broad powers including, *inter alia,* (i) control of all of the Receivership Entities; (ii) the assumption and control of all assets of the Receivership Entities; (iii) the authority to institute any litigation related to the Receivership Entities, including, without limitation, the ability to pursue fraudulent or voidable transfers; and (iv) the full authority to conduct discovery pursuant to Fed.R.Civ.Proc. 30-36 and 45.

11.     Plaintiff is the Receiver Robb Evans & Associates LLC, a limited liability company organized under the laws of the State of California with its principal place of business in the County of Los Angeles, California, provided however that Plaintiff is bringing this action solely in its capacity as Receiver and not in any other capacity.

12.     The Receiver is informed and believes and thereon alleges that defendant Diaz-Cueto is an individual who resides in the State of Florida, County of Miami-Dade. Diaz-Cueto is also a licensed Florida attorney.

13.     The Receiver is informed and believes and thereon alleges that defendant Bella Mar is a corporation organized and existing under the laws of The Bahamas, and beneficially owned, dominated and controlled by defendant Diaz-Cueto. The Receiver is informed and believes and thereon alleges that at all relevant times, Diaz-Cueto was the President of Bella Mar.

14.     This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1331 and § 1367(a) in that this is an action brought by the Receiver appointed by the Issuing Court concerning receivership assets under the Issuing Court's exclusive jurisdiction, as well as the doctrines of supplemental and/or ancillary jurisdiction.

15.     Additionally and alternatively, this Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 in that there is complete diversity between the parties herein and the amount in controversy exceeds $75,000.

16.     This District is the proper venue for this action pursuant to (a) 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the Sanctuary Belize Litigation occurred in this District, and (b) 28 U.S.C. § 1391(b)(3) in that the Defendants, and each of them, are subject to personal jurisdiction in this District, as more particularly set forth herein.  Without limiting the generality of the foregoing, receivership assets in the possession and control of the Defendants are bound by the *in rem* provisions of the Receivership Orders and the Issuing Court has sole jurisdiction over assets of the receivership estate pursuant to the Receivership Orders.

17.     This Court has personal jurisdiction over the Defendants, and each of them, pursuant to 28 U.S.C. §§ 754 and 1692, Fed.R.Civ.Proc. 4(k)(1)(C), and applicable receivership law as a result of, *inter alia,* the Receiver's filing of copies of the complaint and Preliminary Injunctions in the Sanctuary Belize Litigation pursuant to 28 U.S.C. § 754 in the United States District Court for the Southern District of Florida on February 22, 2019 and October 11, 2019, in miscellaneous action case no. 1:19-mc-20695.  Defendants, and each of them, have sufficient minimum contacts with the United States such that personal jurisdiction in the District of Maryland is proper.

### General Allegations

18.     The Sanctuary Belize Litigation is centered on a large scale residential development in Belize (the "Sanctuary Belize Development") described by the FTC as the largest overseas real estate investment scam the FTC has ever targeted.

19.     On August 28, 2020, the Issuing Court entered a Memorandum Opinion which entered a $120,000,000 judgment against certain defendants in the Sanctuary Belize Litigation, including Pukke and Baker, finding that the defendants had falsely asserted (i) that since the Sanctuary Belize Development had no debt or was debt-free it was therefore a

no-risk or less risky investment than a traditionally financed development; (ii) that every dollar of revenue went back into the development; (iii) that the Sanctuary Belize Development would have extraordinary amenities, comparable to those of a small American city; (iv) that the development would be completed in 2-5 years; (v) that there was a robust resale market for lots purchased at the development; and (vi) that Pukke (a recidivist fraudster who had been twice convicted of felonies and who had been imprisoned for illegal activity related to an earlier action brought by the FTC against him and entities he owned and/or controlled) was not involved in the Sanctuary Belize Development when, in fact, he held a leading role in the enterprise.

20.     Individuals involved in the Sanctuary Belize Project sought land in the Bahamas for a new project in an acquisition for which Frank Connelly acted as the lead negotiator.

21.     Frank Connelly's real name is Frank Costanzo.  However, he used several aliases, including Frank Green, Frank Peerless Green, Frank Connelly and Frank Connelly-Costanzo.  Since the Defendants have asserted that they knew him as Frank Connelly, he will be referred to hereafter as "Connelly."

22.     Connelly was the Chief Executive Officer of Newport.   Although a Wyoming corporation, Newport operated out of the same offices in Irvine, California that housed all of the other entities involved in the Sanctuary Belize Litigation and advertised, marketed, distributed or sold real estate investments and related services in the Sanctuary Belize Development.

23.     This new project would be in the Bahamas and to that end, the Receiver is informed and believes and thereon alleges that Connelly, through an introduction made in a Miami-area nightclub, was introduced to Diaz-Cueto.

24.     The Receiver is informed and believes and thereon alleges that there are two nominal or straw shareholders of Bella Mar:  Merlean Poitier ("Poitier") and Tootsie Hunter

("Hunter"). Poitier is a secretary in the law office of Diaz-Cueto's longtime Bahamian lawyer and Hunter works in that firm's accounting office.

25.     The Receiver is informed and believes and thereon alleges that Poitier and Hunter were designated shareholders of Bella Mar solely for the purpose of purportedly complying with Bahamian law and held no actual beneficial interest in Bella Mar.

26.     The Receiver is informed and believes and thereon alleges that Diaz-Cueto, while not a shareholder, owned an undetermined beneficial interest in Bella Mar which afforded him treatment as the true owner of the company. The Receiver is informed and believes and thereon alleges that at all times relevant hereto Diaz-Cueto was and is the alter ego of defendant Bella Mar in that, *inter alia* (1) Bella Mar had grossly inadequate capital; (2) Bella Mar was a shell company with no assets other than possible ownership of rights to the Long Island Parcel, as defined below, no business operations and/or no employees; (3) Bella Mar failed to observe formal legal requirements for the conduct of business of a corporation; (4) Diaz-Cueto disregarded the separate corporate existence of Bella Mar; and (5) Bella Mar was owned, dominated and controlled by Diaz-Cueto, who operated Bella Mar for his personal benefit.

27.     The Receiver is informed and believes and thereon alleges that Bella Mar's only possible asset was a 424-acre parcel of land on Long Island in the Bahamas (the "Long Island Parcel").

28.     The Long Island Parcel was itself comprised of four sub-parcels: (i) a 100-acre section referred to as the Francis William parcel; (ii) a 220-acre section referred to as the Charles Ellis parcel; (iii) a 57-acre section referred to as the Daniel Culmer parcel; and a 47-acre section referred to as the Rosanna Newman parcel.

29.     Long Island, home to the Long Island Parcel, is less than 5% developed and sparsely populated, with a population around 3,000 in the 2010 census. While electricity, internet and phone are available on the entire island, potable water through the Bahamas Water & Sewerage Corporation is not available on the entire island, with some residents and

communities relying on ground water or rain-water catchment.  The two airports to the island are limited to turbo-prop aircraft and cannot provide international point-of-entry services to visitors.

30.     The Receiver is informed and believes and thereon alleges that Bella Mar's acquisition of the Long Island Parcel, to the extent it actually ever acquired legal title to this property, was complicated.

31.     The Receiver is informed and believes and thereon alleges that in 2002 or 2003, another entity owned and controlled by Diaz-Cueto, Island Acquisition Ltd. ("Island Acquisition"), exercised a purchase option for the Long Island Parcel, paying between $10,000 and $100,000 to exercise that option.

32.     The Receiver is informed and believes and thereon alleges that Island Acquisition had the same ownership structure as Bella Mar: a Bahamian corporation purportedly owned by two nominal or straw shareholders who were office workers in the law office of Diaz-Cueto's attorney, with Diaz-Cueto being the real owner of that company.

33.     The Receiver is informed and believes and thereon alleges that at all times relevant hereto Diaz-Cueto was and is the alter ego of Island Acquisition in that, *inter alia* (1) Island Acquisition had grossly inadequate capital; (2) Island Acquisition was a shell company with no assets and no business operations and/or no employees other than possible ownership of rights to the Long Island Parcel and other real estate; (3) Island Acquisition failed to observe formal legal  requirements for the conduct of business of a corporation; (4) Diaz-Cueto disregarded the separate corporate existence of Island Acquisition; and (5) Island Acquisition was owned, dominated and controlled by Diaz-Cueto, who operated Island Acquisition for his personal benefit.

34.     The Receiver is informed and believes and thereon alleges that Diaz-Cueto was one of the persons funding the cash used to exercise Island Acquisition's option on the Long Island Parcel.

35.     Island Acquisition's claim to the Long Island Parcel, along with several other properties, was put in dispute by a third-party and was subject to litigation.

36.     The Receiver is informed and believes and thereon alleges that the litigation referred to in the preceding paragraph was resolved with Island Acquisitions and the other party in essence dividing up the various parcels, with Island Acquisitions taking rights to the Long Island Parcel. The Receiver is informed and believes and thereon alleges that Island Acquisitions then transferred the Long Island Parcel to Bella Mar.

37.     There is no absolute title to land in the Bahamas and litigation regarding disputed title to real estate is common.

38.     The Receiver is informed and believes and thereon alleges that certain property taken by Island Acquisitions from this settlement, not including the Long Island Parcel, was evidenced by a certificate of title which is believed to be the most secure way to have title to real estate in the Bahamas, but which does not reflect absolute title.

39.     The Receiver is informed and believes and thereon alleges that the Long Island Parcel did not have a certificate of title; instead, this parcel was held by Island Acquisitions as merely best title which purports to show that no competing person or entity has a better chain of title over the last 30 years.

40.     The Receiver is informed and believes and thereon alleges that while Diaz-Cueto principally conducted negotiations directly or indirectly with Connelly, Diaz-Cueto knew Pukke was involved in this transaction.  Additionally, Diaz-Cueto had actually dealt with Pukke two years before on another possible purchase of a different tract of land owned by Island Acquisition. The earlier transaction did not materialize as Pukke's offer was rejected by Island Acquisition. At this earlier visit, Pukke disclosed to Diaz-Cueto his prior legal problems with the law.

41.     The Receiver is informed and believes and thereon alleges that Newport, through Connelly, and Diaz-Cueto agreed on a price for the Long Island Parcel. Even though the Long Island Parcel was bought by a purchase option for somewhere between

$10,000 and $100,000, Newport agreed to pay Bella Mar $4,000,000 under a seller-financed transaction, 40 to 400 times what Island Acquisition paid. Newport would pay a down-payment of $750,000 to Bella Mar, followed thereafter by monthly payments of varying amounts to pay the balance of $3,250,000.

42.     Though his company Bella Mar was financing the transaction, and Diaz-Cueto knew that Pukke had problems with the law in the past, Diaz-Cueto did not ask Newport to provide any financial statements or take any steps to ascertain Newport's financial ability to pay the purchase price. The Receiver is informed and believes and thereon alleges that this was because, among other things, Diaz-Cueto knew that $4,000,000 was significantly more than the property was worth, that the property was in a remote and developmentally challenged part of the Bahamas without significant interest from legitimate developers, that payment of the down-payment alone would provide an extraordinary return on what was paid for the option, and that Bella Mar did not have a certificate of title on the Long Island Parcel.

43.     The Receiver is informed and believes and thereon alleges that on or after August 17, 2017 three documents were signed in connection with the transaction regarding the Long Island Parcel: an Agreement for Sale, an Indenture of Conveyance and an Indenture of Mortgage. Shortly thereafter, an Addendum to Agreement for Sale dated August 25, 2017 was signed.  These four documents are referred to herein collectively as the "Deal Documents."  While the Receiver has reviewed different versions of the Deal Documents from different sources, many of the versions of the Deal Documents which have been reviewed have missing sections and missing signatures, copies of the same document were paginated differently, and Bella Mar was referred to with many different spellings, including Bellamar Estates, Bella Mar Estate, Bella Mar Estates and Bell Mar Estates. The Receiver is informed and believes that the Deal Documents attached hereto are the most complete versions of the Deal Documents available to the Receiver.

44.     The Agreement for Sale which references the $4,000,000 purchase price for the Long Island Parcel also references a separate transaction which was an option for another parcel of real estate on Rum Cay.  That option was not exercised and that portion of the Agreement for Sale is not at issue in this Complaint.  Subject to the infirmities described above, a true and correct copy of the Agreement for Sale is attached hereto as Exhibit 1.

45.     Pursuant to the Agreement for Sale, Newport was to be given and then hold in escrow an indenture of conveyance that had been executed by Bella Mar. The Receiver is informed and believes and thereon alleges that the indenture of conveyance is similar to a real estate transfer deed under United States law.  In other words, at the outset of the deal, Newport was to have been given the equivalent of a transfer deed to hold in escrow.  Subject to the infirmities described above, a true and correct copy of the indenture of conveyance, referred to as the Indenture in the document but referred to herein as the "Indenture of Conveyance," is attached hereto as Exhibit 2.

46.      Subject to the infirmities described above, a true and correct copy of the Indenture of Mortgage ("Mortgage") is attached hereto as Exhibit 3.  The Mortgage did not explicitly or clearly set forth any default provisions, cure provisions or remedies in the event that Newport defaulted in payments for the property.  The Mortgage was never filed or recorded.

47.     Subject to the infirmities described above, a true and correct copy of the Addendum to Agreement for Sale dated August 25, 2017 ("Addendum") is attached hereto as Exhibit 4.

48.      It is unclear whether the Deal Documents reflected the parties' actual intentions because, as described below, the Receiver is informed and believes and thereon alleges that the parties had not reached an agreement as to how Newport was going to take title to the Long Island Parcel.

49.     The Receiver is informed and believes and thereon alleges that the parties were contemplating an entirely different transaction than that set forth in the Deal

Documents. Rather than buying the Long Island Parcel outright, as in a traditional real estate transaction as set forth in the Deal Documents, the parties were in reality contemplating a stock purchase where Newport would acquire 100% ownership of Bella Mar.

50.     The Receiver is informed and believes and thereon alleges that since Bella Mar's only asset was the Long Island Parcel, this contemplated transaction would have the same effect as an outright land purchase, but Newport and Bella Mar believed that this structure would avoid the "stamp tax" imposed by the government of The Bahamas on the sale of real estate which is believed to be 10% of the sale price.

51.     The Receiver is informed and believes and thereon alleges that Newport and Bella Mar were mutually mistaken in their belief that the stamp tax could be avoided.   The Receiver is informed and believes and thereon alleges that the stamp tax act is designed to avoid the loophole of a stock sale and provides that the tax shall be paid at the normal rate if the issued shares or other beneficial interest in a company that owns any Bahamian real property are assigned or transferred and therefore, whether denominated as a land sale or a stock sale, the stamp tax would apply.

52.     The Receiver is informed and believes and thereon alleges that both parties also mistakenly believed Newport could legally own property in The Bahamas.  In the Deal Documents, Newport is listed as a California corporation.  The Receiver is informed and believes and thereon alleges that Newport, as a United States corporation, was not authorized to own the Long Island Parcel or shares of Bella Mar unless and until it was properly registered as a foreign corporation with the Bahamian government and that such registration never occurred.

53.      Newport made three $250,000 wire transfers to Bella Mar for the down payment between on or about August 28, 2017 and on or about September 28, 2017.

54.     Around the time the down payments were being tendered, a title issue was discovered with respect to the 47-acre Rosanna Newman tract.  During the survey of the

- 12 -

property, one or more structures were located on that property, meaning that Bella Mar possibly did not own that property, to the extent it ever did, and thus could not convey clean title.

55.     As a result, the parties executed an Agreement to Amend Indenture of Mortgage (the "Amended Mortgage") dated September 28, 2017.  A true and correct copy of what the Receiver believes is the Amended Mortgage is attached hereto as Exhibit 5.

56.     The Amended Mortgage purportedly offered three options to address the issue with the Rosanna Newman parcel: (i) a reduction in the sale price; (ii) Bella Mar offering a different parcel of land to substitute for the Rosanna Newman parcel; or (iii) assurances being provided to Newport that Bella Mar had clean title to the Rosanna Newman parcel.

57.     The Receiver is informed and believes and thereon alleges that although the Amended Mortgage presented those three options, in actuality the only option that Bella Mar was capable of performing was the reduction in price.  The purchase price was reduced by $1,200,000, to $2,800,000, and the monthly installment payments for the first year were reduced to $35,000.

58.     The Receiver is informed and believes and thereon alleges that Bella Mar offered the $1,200,000 reduction in price, even though Diaz-Cueto and Bella Mar believed that the Rosanna Newman tract had little value, because the original price of $4,000,000 was grossly excessive for the Long Island Parcel.

59.     Thereafter, Newport made nine monthly payments of $35,000 each to Bella Mar until shortly before the inception of the Sanctuary Belize Litigation, which together with the three down payments of $250,000 each, total $1,065,000 in payments (sometimes referred to herein as the "Subject Transfers").

60.     The Receiver is informed and believes and thereon alleges that the source of the $1,065,000 paid to Bella Mar were misappropriated funds from lot purchasers for the Sanctuary Belize Project.

61.     The Receiver is informed and believes and thereon alleges that at the time the Subject Transfers were made to Bella Mar, these payments harmed existing and future creditors of the Receivership Entities and the receivership estate.

62.     The Receiver is informed and believes and thereon alleges that the lot owners in Sanctuary Belize did not know that their funds would be used for the attempted acquisition of the Long Island Parcel.

63.     The Receiver is informed and believes and thereon alleges that Newport did not receive reasonably equivalent value from Bella Mar for the attempted purchase of the Long Island Parcel.  The Receiver is informed and believes and thereon alleges that the value of the Long Island Parcel was far below the $4,000,000 purchase price and the value of the Long Island Parcel after removing the Rosanna Newman parcel was far below the $2,800,000 reduced purchase price, and that the inadequacy of the value of the Long Island Parcel was compounded by the title issues with the property, the defects and lack of clarity in the Deal Documents and the mutual mistakes of fact surrounding the Deal Documents.

64.     The Receiver is informed and believes and thereon alleges that at all relevant times the Receivership Entities were being operated as a common enterprise, were individually and collectively insolvent and had actual and contingent debts in excess of $120,000,000.

65.     Commencing on February 18, 2018, Newport made several monthly $35,000 payments more or less timely until the August 18, 2018 payment.

66.     Newport failed to timely make the August 18, 2018 payment.  On September 4, 2018, Diaz-Cueto sent correspondence (the "August Notice of Default") to Connelly, indicating that the August payment had been missed, and that this payment needed to be made by an unspecified date to "avoid foreclosure."  The August Notice of Default was sent by Diaz-Cueto on his law office letterhead with the sole method of transmission being email to Connelly at frank@eco-futures.com. A true and correct copy of the August Notice of Default, with redactions, is attached hereto as Exhibit 6.

67.     None of the Deal Documents or the Amended Mortgage provide any clarity on what constitutes a default or what Bella Mar's remedies would be in the event of such default.

68.     Article 5 of the Mortgage states that Bella Mar would have a "power of sale" but only after (i) a default in payment; (ii) demand made upon Newport to tender the defaulted payment; and (iii) Newport fails to make that payment within 21 days after the date of demand. The Mortgage does not define what "power of sale" means and does not provide any procedure as to the notice to be provided to Newport in the event of default. Newport eventually tendered the August 18, 2018 payment to Bella Mar.  Nowhere in the Mortgage or other Deal Documents is it stated that possession to the Long Island Parcel would automatically revert to Bella Mar upon a default in payment, confirmed by Diaz-Cueto's use of the term that payment was needed to "avoid foreclosure" in the August Notice of Default.

69.     Newport then missed the November 18, 2018 payment in light of the Sanctuary Belize Litigation and the receivership.  November 18, 2018 was a Sunday. Around that time, Diaz-Cueto called Connelly and learned of the Sanctuary Belize Litigation.  The next day, Monday at 8:39 a.m., Diaz-Cueto issued another notice of default (the "November Notice of Default"), despite the fact that there was a broad stay against creditor activity under the TRO and despite the fact that Newport was a Receivership Entity. A true and correct copy of the November Notice of Default, with redactions, is attached hereto as part of Exhibit 7.

70.     The November Notice of Default differs markedly from the August Notice of Default.  The Receiver is informed and believes that it was issued in violation of the stay against creditor action under the TRO.  The Receiver is further informed and believes that assuming any default notice could be given despite the existence of the receivership, it was issued prematurely, on the day payment was due since the original payment date was a Sunday.  The November Notice of Default is only an email.  Unlike the August Notice of

Default which did not demand payment by a date certain, the November Notice of Default demands payment by "the time specified in the purchase agreement, accompanying mortgage and addendum" without specifying the actual due date and despite the Deal Documents not providing a clear explanation of such deadline. The August Notice of Default referenced Bella Mar's rights to foreclose property, but the November Notice of Default states that if payment is not timely made, then Newport will be "issued a Final Default letter thereby terminating all its rights title and interest to the subject land in Long Island, Bahamas." The term "Final Default letter" is not defined in the Deal Documents, the Amended Mortgage or the November Notice of Default.

71.     The Receiver is informed and believes and thereon alleges that Diaz-Cueto had several conversations with Connelly after the November Notice of Default and before the payment was due, in which Connelly discussed the Sanctuary Belize litigation, expressed worry about his family and stated that he lost touch with "Rod," presumably referring to Rod Kazazi who was also involved in the Sanctuary Belize Project and is a defendant in the Sanctuary Belize Litigation.

72.      The Receiver is informed and believes and thereon alleges that Diaz-Cueto became increasingly concerned about Sanctuary Belize Litigation and its effect on the Defendants' ability to recover the balance then purportedly owed by Newport, which would be $1,735,000.  The Receiver is informed and believes and thereon alleges that Diaz-Cueto decided to purportedly "terminate" any and all rights that Newport had in the Long Island Parcel and keep $1,065,000, the entire amount which had been paid by Newport.

73.     The Receiver is informed and believes and thereon alleges that Diaz-Cueto knew or should have known that the Sanctuary Belize Litigation impacted Bella Mar's ability to get future payments for the Long Island Parcel, that Newport was a part of the Sanctuary Belize Litigation and that there was a stay in effect preventing Defendants from taking any action to the detriment of Newport without leave of the Issuing Court.

74.     Diaz-Cueto issued another email at 7:56 a.m. on Monday, December 10, 2018 (the "Final Notice Email").  A true and copy of the Final Notice Email, with redactions, is also attached hereto as part of Exhibit 7.  If Newport was, *arguendo*, operating under a 21-day deadline, it was not afforded the full time period, because the Final Notice Email, like the November Notice of Default, was issued prematurely.  Even if not premature, the Receiver is informed and believes and thereon alleges that a stay was in effect and neither the November Notice of Default nor the Final Notice Email should have been issued.

75.     The Final Notice Email states that "time to cure the default has expired" and that Newport's "rights under the purchase and sales agreement and mortgage with Bellamar Estates Ltd. are terminated and extinguished as a result of Newport Land Group LLC., for breach of contract [SIC]".  The Receiver is informed and believes and thereon alleges that there is no basis under the Deal Documents, the Amended Mortgage, or otherwise, to issue the Final Notice Email.

76.     Further, without specifying any pertinent sections in the Deal Documents or Amended Mortgage, by prematurely and improperly issuing the November Notice of Default, by failing to permit Newport or the Receiver to cure any purported default, and without any clear authorization on what the payment deadline was or what Bella Mar's rights were in the event of default, the Receiver is informed and believes and thereon alleges that the Defendants wrongfully took the untenable and improper position that ownership of the Long Island Parcel, without any court action or formal notice other than two emails, had reverted back to Bella Mar and that it was also permitted to retain $1,065,000, in exchange for which Newport received nothing.

77.     The Receiver is informed and believes and thereon alleges that of the $1,065,000 in payments made by Newport to Bella Mar, Diaz-Cueto thereafter received not less than $881,245.00 of those payments directly from Bella Mar.

78.     The Receiver is informed and believes and thereon alleges that the payments received by Bella Mar and Diaz-Cueto were made in exchange for a vastly overpriced parcel

of land being sold by ambiguous and unenforceable Deal Documents later to be illegally terminated by Diaz-Cueto in both violation of the Deal Documents and the stay created by the TRO.

**FIRST CLAIM FOR RELIEF**
**RESCISSION**
**(AGAINST BELLA MAR)**

79.     The Receiver repeats and re-alleges the allegations of paragraphs 1 through 78, inclusive, and by reference thereto, incorporates the same herein as though more fully set forth at length.

80.     The Receiver alleges that the Deal Documents and Amended Mortgage, to the extent they form an enforceable contract, must be rescinded.

81.     A contract must be rescinded if it is illegal or unconscionable. Here, the purported contract is unconscionable and illegal in that payments for Bella Mar came from misappropriated funds from lot purchasers for the Sanctuary Belize Project.  The lot purchasers were specifically and falsely told that their funds would go back into the Sanctuary Belize Project and used for no other purposes. It is unconscionable that the Defendants should retain $1,065,000 and the Receiver and the receivership estate obtain nothing whatsoever.

82.     A contract should be also rescinded if it is made with mutual mistake.  Here, there are at least three mutual mistakes: (i) the mutual belief of the parties that the deal was, or was going to turn into, a stock sale even though the Deal Documents and Amended Mortgage indicate the deal was a traditional land sale; (ii) the mutual belief of the parties that the deal was structured or to be structured in a way that would avoid imposition of the stamp tax; and (iii) the mutual belief of the parties that Newport was authorized to own a business or real estate in the Bahamas.

83.     Additionally, the Deal Documents and Amended Mortgage should be rescinded, because Newport received inadequate consideration by agreeing to pay $2.8 million for the Long Island Parcel, after removing the Rosanna Newman tract, when Island

Acquisition had purchased the entire Long Island Parcel for an option price of between $10,000 and $100,000.

84.     Additionally, the Deal Documents and Amended Mortgage should be rescinded because otherwise the Defendants receive $1,065,000 in exchange for which the receivership estate obtains nothing whatsoever.

85.     Additionally, the Receiver is informed and believes and thereon alleges that the Deal Documents and Amended Mortgage should be rescinded because Bella Mar did not have sufficient title in the Long Island Parcel to convey ownership.

86.     With the Deal Documents and Amended Mortgage rescinded, this Court should enter judgment against Bella Mar and in favor of the Receiver the sum of not less than $1,065,000, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

**SECOND CLAIM FOR RELIEF**
**BREACH OF CONTRACT**
**(AGAINST BELLA MAR)**

87.     The Receiver repeats and re-alleges the allegations of paragraphs 1 through 86, inclusive, and by reference thereto, incorporates the same herein as though more fully set forth at length.

88.     The Receiver alleges in the alternative that the Deal Documents and Amended Mortgage, to the extent they are not rescinded by the Court, constitute a contract.

89.     Newport performed under the contract, making payments totaling $1,065,000.

90.     Bella Mar materially breached the contract by, among other things,  (i) improperly and prematurely issuing the November Notice of Default; (ii) improperly requiring Newport to cure any payment default in 21 days; (iii) to the extent the 21-day period was the applicable deadline, not allowing Newport the full 21 days to cure the default; (iv) taking the position that ownership of the Long Island Parcel had reverted back to Bella Mar, without any support in the Deal Documents or Amended Mortgage, without

- 19 -

any Court action or without any formal notice or other action other than two emails; and (v) violating the stay against creditor action imposed by the TRO.

91.     As a result of this material breach, the Receiver has suffered damages from Bella Mar in the sum of not less than $1,065,000 according to proof at trial or at the time of entry of judgment, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

**THIRD CLAIM FOR RELIEF**
**AVOIDANCE OF FRAUDULENT TRANSFER UNDER**
**CALIFORNIA CIVIL CODE 3439.04(a)(1)**
**(AGAINST BOTH DEFENDANTS)**

92.     The Receiver repeats and re-alleges the allegations of paragraphs 1 through 91, inclusive, and by reference thereto, incorporates the same herein as though more fully set forth at length. The Receivership Entities were conducting a fraudulent business enterprise, both in connection with the Sanctuary Belize Project and other peripheral purported projects reflected by, among other activities, the attempt to acquire the Long Island Parcel and another purported project in Costa Rica involving Newport.  As a result of the Receivership Entities' fraudulent business enterprise, there was never any legitimate and valid business and the Receivership Entities were accruing liabilities each time another consumer was duped into acquiring property in Sanctuary Belize or purporting to acquire rights to a lot in Costa Rica or elsewhere, as reflected in the $120 million judgments ultimately entered in the Default Judgment and the Pukke Final Judgment.

93.     California Civil Code § 3439.04(a)(1) provides that a transfer made or obligation incurred by a debtor is fraudulent as to an existing or future creditor if the debtor made the transfer or incurred the obligation with the actual intent to hinder, delay or defraud any of the debtor's creditors.

94.     The Subject Transfers to Bella Mar were made with the actual intent to hinder, delay or defraud creditors of the Receivership Entities as contemplated by California Civil Code § 3439.04(a)(1).

95.     Further, since Newport and the other Receivership Entities were engaged in a fraudulent enterprise, there is a presumption that the Subject Transfers were made to Bella Mar with the actual intent to hinder, delay or defraud creditors of the Receivership Entities as contemplated by California Civil Code § 3439.04(a)(1).

96.     There is now due and owing from defendant Bella Mar the sum of not less than $1,065,000 representing the voidable transfers received by Bella Mar and judgment should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

97.     There is now owing from defendant Diaz-Cueto the sum of not less than $881,245.00 representing the voidable transfers received by Diaz-Cueto and judgment should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

**FOURTH CLAIM FOR RELIEF**
**AVOIDANCE OF FRAUDULENT TRANSFER UNDER**
**CALIFORNIA CIVIL CODE 3439.04(a)(2)(A)**
**(AGAINST BOTH DEFENDANTS)**

98.     The Receiver repeats and re-alleges the allegations of paragraphs 1 through 97, inclusive, and by reference thereto, incorporates the same herein as though more fully set forth at length.

99.     At the time the Subject Transfers were tendered, the Receivership Entities had harmed existing and future creditors of the receivership estate.

100.    California Civil Code § 3439.04(a)(2)(A) provides that a transfer made or obligation incurred by a debtor is fraudulent as to an existing or future creditor if the debtor

made the transfer or incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction.

101.    The above-mentioned transfers to Bella Mar are avoidable transfers since at the time of each payment, Newport did not receive a reasonably equivalent value in exchange for the transfer or obligation, and the Receivership Entities were engaged in or were about to engage in a business or a transaction for which the remaining assets of the Receivership Entities were unreasonably small in relation to the business or transaction as contemplated by California Civil Code § 3439.04(a)(2)(A).

102.    Payment of the $1,065,000 representing the voidable transfers received by Bella Mar should be avoided and judgment should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

103.    Payment of the $881,245.00 representing the voidable transfers received by Diaz-Cueto should be avoided and judgment should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

**FIFTH CLAIM FOR RELIEF**
**AVOIDANCE OF FRAUDULENT TRANSFER UNDER**
**CALIFORNIA CIVIL CODE 3439.04(a)(2)(B)**
**(AGAINST BOTH DEFENDANTS)**

104.    The Receiver repeats and re-alleges the allegations of paragraphs 1 through 103, inclusive, and by reference thereto, incorporates the same herein as though more fully set forth at length.

105.    At the time the Subject Transfers were tendered, the Receivership Entities had harmed existing and future creditors of the receivership estate.

106.    California Civil Code § 3439.04(a)(2)(B) provides that a transfer made or obligation incurred by a debtor is fraudulent as to an existing or future creditor if the debtor made the transfer or incurred the obligation without receiving reasonably equivalent value in exchange for the transfer or obligation and the debtor intended to incur, or believed or reasonably should have believed that the debtor would incur, debts beyond the debtor's ability to pay as they became due.

107.    The above-mentioned transfers to Bella Mar are avoidable transfers since at the time of each payment, Newport did not receive a reasonably equivalent value in exchange for the transfer or obligation, and the Receivership Entities intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

108.    Payment of the $1,065,000 representing the voidable transfers received by Bella Mar should be avoided and judgment should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

109.    Payment of the $881,245.00 representing the voidable transfers received by Diaz-Cueto should be avoided and judgment should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer

until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

**SIXTH CLAIM FOR RELIEF**
**AVOIDANCE OF FRAUDULENT TRANSFER UNDER**
**CALIFORNIA CIVIL CODE 3439.05**
**(AGAINST BOTH DEFENDANTS)**

110.    The Receiver repeats and re-alleges the allegations of paragraphs 1 through 109, inclusive, and by reference thereto, incorporates the same herein as though more fully set forth at length.

111.    At the time the Subject Transfers were tendered, the Receivership Entities had harmed existing and future creditors of the receivership estate.

112.    California Civil Code § 3439.05 provides that a transfer made or obligation incurred by a debtor is fraudulent as to a creditor whose claim arose before the transfer was made or the obligation was incurred if the debtor made the transfer or incurred the obligation without receiving a reasonably equivalent value in exchange for the transfer or obligation and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer or obligation.

113.    Each of the above-referenced transfers are avoidable transfers since at the time of each Subject Transfers, Newport made each of these payments without receiving a reasonably equivalent value in exchange for the transfer or obligation and the Receivership Entities were insolvent at that time or they became insolvent as a result of the transfer or obligation.

114.    Payment of the $1,065,000 representing the voidable transfers received by Bella Mar should be avoided and judgment should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

115.    Payment of the $881,245.00 representing the voidable transfers received by Diaz-Cueto should be avoided and judgment should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

**SEVENTH CLAIM FOR RELIEF**
**UNJUST ENRICHMENT/CONSTRUCTIVE TRUST**
**(AGAINST BOTH DEFENDANTS)**

116.    Plaintiff repeats and re-alleges the allegations of paragraphs 1 through 115, inclusive, and by reference thereto incorporates the same herein as though more fully set forth at length.

117.    As set forth above, the Defendants received the Subject Transfers from the Receivership Entities and the source of payments of the Subject Transfers were funds paid by Sanctuary Belize Project lot investors defrauded by the Receivership Entities.

118.    Plaintiff is informed and believes and thereon alleges that the funds transferred to Defendants comprising the Subject Transfers as alleged hereinabove constitute ill-gotten gains and the proceeds of illegal and fraudulent activities obtained in violation of applicable law, including without limitation the FTC Act, the FTC rules and regulations and applicable consumer protection statutes, which rightfully belong to the receivership estate for the benefit of the claimants against the receivership estate, the retention of which would leave defendants unjustly enriched.

119.    Whether the source of payments made by Newport to Bella Mar were *bona fide* funds or ill-gotten gains, it is unjust for Bella Mar to receive the benefit of the Subject Transfers from Newport, then improperly issue the November Notice of Default prematurely, then improperly require Newport to cure any payment default without giving Newport the proper amount of time to cure the default and then take the position that ownership of the Long Island Parcel had reverted back to Bella Mar, without (i) any support

in the Deal Documents or Amended Mortgage; (ii) any Court action;  (iii) formal notice other than two emails; and (iv) in violation of the stay in the TRO.

120.    This court should enter judgment against Defendant Bella Mar in the sum of not less than $1,065,000 and a constructive trust should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

121.    This court should enter judgment against defendant Diaz-Cueto in the sum of not less than $881,245.00, and a constructive trust should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

**EIGHTH CLAIM FOR RELIEF**
**PIERCE THE VEIL/ALTER EGO**
**(AGAINST DIAZ-CUETO)**

122.    Plaintiff repeats and re-alleges the allegations of paragraphs 1  through 121, inclusive, and by reference thereto incorporates the same herein as though more fully set forth at length.

123.    Plaintiff is informed and believes and thereon alleges that at all times relevant hereto Diaz-Cueto was and is the alter ego of defendant Bella Mar in that, *inter alia* (1) Bella Mar had grossly inadequate capital; (2) Bella Mar was a shell company with no assets other than possible ownership of rights to the Long Island Parcel, no business operations and/or no employees; (3) Bella Mar failed to observe formal legal requirements for the conduct of business of a corporation; (4) Diaz-Cueto disregarded the separate corporate existence of Bella Mar; and (5) Bella Mar was owned, dominated and controlled by Diaz-Cueto, who operated Bella Mar for his personal benefit.

124.    Plaintiff contends that the facts and circumstances warrant that the Court pierce the corporate veil of Bella Mar with Diaz-Cueto being held personally liable for any

and all monetary or other judgment or relief granted in this Complaint in favor of Plaintiff against Bella Mar.

**NINTH CLAIM FOR RELIEF**
**TURNOVER OF RECEIVERSHIP PROPERTY**
**(AGAINST BOTH DEFENDANTS)**

125.   The Receiver repeats and re-alleges the allegations of paragraphs 1 through 124, inclusive, and by reference thereto, incorporates the same herein as though more fully set forth at length.

126.   The Receiver is informed and believes and thereon alleges that funds and assets comprising the Subject Transfers received by the Defendants, and each of them, constitute transfers from Newport, a Receivership Entity, of what should otherwise be funds in the receivership estate and that are ill-gotten gains and the proceeds of illegal and fraudulent activities obtained in violation of applicable law, including without limitation the FTC Act, the FTC rules and regulations and applicable state consumer protection laws.

127.   Pursuant to, among other provisions, § XXII.C of the TRO and other provisions in the other Receivership Orders, Defendants were prohibited from taking custody or control of any receivership assets, including the Long Island Parcel.

128.   The funds and payments comprising the Subject Transfers received by the Defendants, and each of them, constitute property of the receivership estate which the Defendants, and each of them, are required to turn over to Plaintiff as the Receiver pursuant to the Receivership Orders.

129.   Defendants, and each of them, wrongfully refuse to turn over these sums to the receivership estate and the Plaintiff despite wrongfully obtaining said funds and despite Plaintiff's demand therefor.

130.   There is now due and owing from defendant Bella Mar the sum of not less than $1,065,000 and judgment should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer until such

payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

131.    There is now owing from defendant Jorge Diaz-Cueto the sum of not less than $881,245.00, and judgment should be entered in Receiver's favor for that amount, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first.

**WHEREFORE**, for the reasons stated above, the Receiver respectfully ask the court to award it damages as follows:

(a)    on the First Claim for Relief, a judicial declaration rescinding any contractual relationship between Newport and Bella Mar and judgment against Bella Mar in the sum of not less than $1,065,000, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first;

(b)    on the Second Claim for Relief, judgment in the sum of not less than $1,065,000 against Bella Mar, plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first;

(c)    on the Third through Sixth and Ninth Claims for Relief, judgment on each claim in the sum of not less than $1,065,000 against Bella Mar and not less than $881,245.00 against Diaz-Cueto plus interest thereon at the legal rate from the date of each payment or transfer until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first;

(d)    on the Seventh Claim for Relief,  judgment against Bella Mar in the sum of not less than $1,065,000 and against Diaz-Cueto in the sum of not less than $881,245.00 and a constructive trust to be entered against each Defendant in Receiver's favor for the respective judgment amount, plus interest thereon at the legal rate from the date of each payment or transfer

until such payments or transfers are repaid to Plaintiff in full or date of entry of judgment, whichever occurs first;

       (e)      on the Eighth Claim for relief, a judgment that Diaz-Cueto shall be personally liable to Plaintiff for any and all monetary or other judgment or relief granted in this Complaint in favor of Plaintiff and against Bella Mar; and

       (f)      all other just and proper relief.

Dated:  August 12, 2021

By:  /s/ James E. Van Horn         
 James E. Van Horn (Bar No. 29210)
BARNES & THORNBURG LLP
1717 Pennsylvania Avenue, NW, Suite 500
Washington, DC 20006
Telephone:  (202) 371-6351
Facsimile:  (202) 289-1330
Email:      jvanhorn@btlaw.com

Gary Owen Caris, Calif. Bar No. 088918
*Pro Hac Vice* Pending
BARNES & THORNBURG LLP
2029 Century Park East, Suite 300
Los Angeles, CA 90067
Telephone:  (310) 284-3880
Facsimile:  (310) 284-3894
Email:      gcaris@btlaw.com

Kevin C. Driscoll, Jr. (IL ARDC 6272159)
*Pro Hac Vice* Pending
BARNES & THORNBURG LLP
One North Wacker Dr., Suite 4400
Chicago, IL 60606
Telephone:  (312) 357-1313
Facsimile:  (312) 759-5646
Email:      kevin.driscoll@btlaw.com

Attorneys for  Plaintiff, Robb Evans &
Associates LLC, as Court-appointed
Receiver in the *In re Sanctuary Belize
Litigation*